IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

ELIANE LEVY, and those she
represents,

Plaintiff,

v.                                                    No. 11-CV-00978 WYD-KLM

CLAYTON DOWNEY WORTHINGTON, PROGRESSIVE
OVERLOAD, LLC, MARK TYSON,
GORDON KACALA, RITA KACALA
COLORADO VELODROME ASSOCIATION, INC.,
USA CYCLING, INC., and
UNITED STATES OLYMPIC COMMITTEE,

Defendants.

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT MARK TYSON'S MOTION FOR SUMMARY JUDGMENT [DOC. NO. 42]

PLAINTIFF ELIANE LEVY and those she represents, by and through counsel of record, Lee Rosenbaum, Esq. and O'Friel and Levy, P.C., by Pierre Levy, Esq. hereby responds in opposition to Defendant Mark Tyson's Motion for Summary Judgment as to All Claims Against Mark Tyson. Because genuine issues of material fact exist with respect to Defendant Tyson's status and role in the accident of June 19, 2010, and because the motion is premature and Plaintiff cannot fully and adequately respond to the motion without completing her discovery, Defendant's motion should be denied.

**Background**

This case involves a collision, with resulting fatal injuries to Plaintiff's decedent, that occurred at the Velodrome in Colorado Springs on June 19, 2010. As averred in Plaintiff's First Amended Complaint, and as not materially disputed by Defendants, on that day Plaintiff's decedent Emile Levy was lawfully at the Velodrome, practicing speed runs, or timing runs. This practice consists of riding slowly on the upper section of the velodrome's banked oval, and then descending to the inner part of the track, at maximum speed, and measuring the time the athlete takes to cover a certain distance. The type of bicycle used in these exercises has no gears, and no brakes. During the speed runs, the cyclist assumes a head-down, streamlined position and has limited view of the track ahead.

Defendant Mark Tyson, acting on behalf of Defendant Colorado Velodrome Association, was in charge of the Velodrome that day. He had the keys to the facility, opened the facility, and generally supervised all that was happening at the facility that day. At some point during the day, Defendants Gordon and Rita Kacala, aided by Defendant Clayton Worthington, entered the track and began practicing standing starts. Defendants Gordon Kacala and Rita Kacala did not position themselves on the infield of the track, but rather positioned themselves, with the assistance and advice of Defendant Worthington, on an active part of the track in a location where other athletes using the track were expected to, and did, travel. The Kacala Defendants positioned themselves so that they could not see the athletes cycling on the track. Defendant Tyson observed these events, but did nothing. Instead, by his own admission he went into his offices to "take a break

-2-

from the .... heat," and "get something to drink."  Shortly thereafter, the collision between Emile Levy and the Kacala Defendants occurred, rendering Mr. Levy a ventilator-dependent quadriplegic, and leading to his death nine weeks later.

The Court held a Rule 16 conference on June 21, 2011, thus allowing discovery to begin.  All parties who had entered an appearance served initial disclosures on that day.  Thereafter, on July 21, 2011, Plaintiff sent extensive discovery to all Defendants, including Defendants Colorado Velodrome Association ("CVA") and Mark Tyson.  Four days later, well before any discovery response was due, Defendant Tyson filed his motion for summary judgment.

Thus, Defendant Tyson has filed his motion prior to responding to any written discovery, and prior to being deposed.  As of the filing of this Response, no Defendant has provided any responses to Plaintiff's first round of discovery.

In his motion, Defendant Tyson makes the following claims: first, he claims to have been a volunteer, without any official connection to Defendant CVA, on June 19, 2010, and to enjoy immunity from liability under the Volunteer Protection Act, 42 U.S.C. § 14503.  Second, Defendant Tyson claims to be immune from liability under the Colorado's volunteer act, C.R.S. 13-21-116(2)(a).  Finally, Tyson claims that he did not act sufficiently willfully, wantonly, or purposefully as to take his conduct beyond ordinary negligence.  As part of his argument, Defendant Tyson claims that Colorado law does not allow acts of omission to serve as a basis for a finding of reckless or grossly negligent conduct.

Because genuine issues of material fact exist with respect to Defendant Tyson's role

in supervising the Velodrome on June 19, 2010, on his claimed status as a "volunteer," and on the level of purposefulness to attach to his tortious conduct, and because at a minimum Plaintiff requires more time under Fed. R. Civ. P. 56(d) to complete her discovery in this matter to fully and properly respond to Defendant Tyson's arguments, the motion should be denied.

### Plaintiff's Rule 56(c) Response to Defendant's Statement of Undisputed Material Facts

1. Disputed.  Defendant's own affidavit shows that he acted for CVA on June 19, 2010.  He had the keys to the Velodrome, he opened the facility, he monitored the overall activities, and ensured that only authorized persons used the facilities.  Defendant's Exhibit A, ¶ 4.  He had supervisory control and oversight of the facility.  Further, Plaintiff Eliane Levy's affidavit states that Defendant Tyson was the person in charge of the Velodrome on that day, and that he controlled what was going on at the Velodrome.  Affidavit of Eliane Levy, attached hereto as Exhibit "1."  In addition, pursuant to Fed. R. Civ. P. 56(d), Plaintiff cannot at this time present facts essential to justify her position that Defendant Tyson was not a "volunteer," as that term is defined by the Volunteer Protection Act, 42 U.S.C. § 14503, or Colorado's C.R.S. 13-21-116(2)(a).  Affidavit of Pierre Levy, attached hereto as Exhibit "2."

2. Disputed in part.  While Defendant Tyson may not have been present at the moment of impact, he was present throughout the time that Emile Levy and the Kacala Defendants were on the track at the same time.  Affidavit of Eliane Levy, Exhibit 1.

Moreover, Defendant Tyson's own affidavit states that he left the track only "shortly" before the impact.  Defendant's Exhibit A.  A factual inquiry, therefore, is required to determine at what point Tyson left the track.

3.  Disputed.  Pursuant to Fed. R. Civ. P. 56(d), Plaintiff cannot at this time present facts essential to justify her position with respect to Defendant Tyson's status on the day of the accident.  Affidavit of Pierre Levy, Exhibit 2.

4.  Disputed.  Pursuant to Fed. R. Civ. P. 56(d), Plaintiff cannot at this time present facts essential to justify her position with respect to Defendant Tyson's status on the day of the accident.  Affidavit of Pierre Levy, Exhibit 2.

5.  Disputed.  Pursuant to Fed. R. Civ. P. 56(d), Plaintiff cannot at this time present facts essential to justify her position with respect to the status of Defendant CVA on the day of the accident.  Affidavit of Pierre Levy, Exhibit 2.  Further, Defendant's Exhibit B is dated November 3, 1989, and does not demonstrate that Defendant CVA maintained its 501(c)(3) status as of June 19, 2010.  The exhibit and that part of the Tyson Affidavit, therefore, fail to properly support a claimed fact and should be stricken pursuant to Fed. R. Civ. P. 56(c).

6.  Disputed.  Pursuant to Fed. R. Civ. P. 56(d), Plaintiff cannot at this time present facts essential to justify her position with respect to any licensing requirements Defendant Tyson may have been subjected to on June 19, 2010.

7.  Disputed.  Defendant Tyson was on the Velodrome track and observed both Emile Levy and the Kacala Defendants on the Velodrome track on June 19, 2010.  Affidavit

of Eliane Levy, Exhibit 1.  Further, by his own admission Defendant Tyson left the track

only "shortly" before the impact.  He had the opportunity, therefore, to prevent the Kacalas

from taking to the track, or to warn Emile Levy of dangerous activities which were going on

prior to the impact.  Defendant's Exhibit A, ¶ 7.

8.  Disputed.  By Defendant Tyson's own admission, he opened the facility and

monitored all activities at the Velodrome on June 19, 2010.  Defendant's Exhibit A.

Further, Defendant Tyson was the person in charge of the Velodrome that day, and had

been the person in charge of the Velodrome on prior occasions, so that on June 19, 2010,

he seemed to be the person in charge, just like he had been before.  Affidavit of Eliane

Levy, Exhibit 1.  Further, according to Defendant United States Olympic Committee

("USOC"), Mark Tyson was the supervisor of the Velodrome at the time of the accident.

USOC Velodrome June 19, 2010 Incident Report, Bates USOC-00010-00013, attached

hereto as Exhibit "3."

9.  Disputed.  Pursuant to Fed. R. Civ. P. 56(d), Plaintiff cannot at this time present

facts essential to justify her position with respect to any policies or practices that may have

been in place on June 19, 2010 with respect to practice sessions at the Velodrome.

Affidavit of Pierre Levy, Exhibit 2.

10.  Disputed.  By his own admission, Defendant Tyson was a past Director of

Defendant CVA.  Tyson Affidavit, Defendant's Exhibit A.  He would, therefore, have been

in a position to implement policies and/or procedures that would have prevented what

occurred on June 19, 2010.  Further, pursuant to Fed. R. Civ. P. 56(d), Plaintiff cannot at

this time present facts essential to justify her position with respect to any policies or practices that may have been in place on June 19, 2010, or with respect to policies and procedures Defendant Tyson could have been in a position to implement.  Affidavit of Pierre Levy, Exhibit 2.

11. Disputed.  Defendant CVA, Defendant Tyson, Defendant USA Cycling, Inc., the Kacala Defendants, and Defendant USOC all affirm, by relying on an exculpatory release attached as Exhibit B to Defendant USA Cycling's Answer to the Complaint, that cycling is an inherently dangerous sport, that there is an inherent risk of collisions with other riders and/or pedestrians, and that it involves the possibility of serious physical injury or death. Exhibit B to USA Cycling, Inc. Answer and Counterclaim [Doc. No. 25]; Exhibit A to Tyson and CVA Answer and Counterclaim [Doc. No. 24].

### Plaintiff's Rule 56(c) Statement of Additional Undisputed Material Facts

12. The Colorado Springs Velodrome is controlled by Defendant USOC.  Lease and Joint Use Agreement, Bates USOC-00015-00035, at 14, 16, attached hereto as Exhibit "4."

13. Defendant USOC contracted, for the year 2010, with Defendant CVA to, in part, establish training sessions at the Velodrome, provide daily oversight of the facility, open the facility on a daily basis, provide on-site management throughout the time the facility is open, lock the facility on a daily basis, report to Defendant USOC any loss or damaged property that occurred on any given day, make every effort to promote the sport of cycling and the USOC, and collect fees from riders who participate in training times, for the benefit

of both USOC and Defendant CVA.  Defendant CVA receives compensation for providing those services to Defendant USOC.   Services Agreement, Bates USOC-00036-00051, attached hereto as Exhibit "5."

13.   By his own admission, Defendant Tyson opened the Velodrome on June 19, 2010 and monitored activities taking place there.  Affidavit of Mark Tyson, Defendant's Exhibit A.  Defendant Tyson was the "on-site management" for Defendant CVA pursuant to the Services Agreement.

14.   Defendant CVA and Defendant Tyson were aware, prior to June 19, 2010, of at least one prior collision at the Velodrome involving a cyclist practicing speed runs and a cyclist practicing standing starts.   Defendant Mark Tyson and Colorado Velodrome Association, Inc.'s Answer to Amended Complaint and Counterclaim for Indemnification, ¶ 15, attached hereto as Exhibit "6."

15.   Defendant USOC has implicitly concluded that best practices regarding safety were not in place and not enforced at the Colorado Springs Velodrome on June 19, 2010. Exhibit 3.

16.   Defendant CVA is obligated to provide rules and regulations for racing and training sessions.   Exhibit 3.   Defendant Tyson claims that there are no rules and regulations for training sessions.  Affidavit of Mark Tyson, Defendant's Exhibit A.

17.   Plaintiff's decedent Mr. Emile Levy was training at the Velodrome on June 19, 2010 under the oversight of Defendant CVA.  Exhibit 3.

**Argument**

I.   **The summary judgment standard is deferential to the nonmovant; and all reasonable inferences must be drawn in the nonmovant's favor.**

While summary judgment may be granted "where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to as to any material fact and the moving party is entitled to judgment as a matter of law," *Baltazar v. Shinseki*, 2011 U.S. Dist. LEXIS 71603 (D. Colo. July 1, 2011) (citations omitted), the Court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Id.* "All doubts must be resolved in favor of the existence of triable issues of fact." *Id.* This is the standard applicable in the Tenth Circuit. *See, e.g., Merrifield v. Board of County Commissioners*, 2011 U.S. App. LEXIS 15363 (10th Cir. July 25, 2011).

In the case at bar, disputed issues of fact with respect to Defendant Tyson's control of the Colorado Springs Velodrome, with respect to his claimed immunity from liability as a "volunteer," and with respect to his activities of June 19, 2010 all preclude the entry of summary judgment in his favor.

II.   **Disputed issues of fact, and incomplete discovery, prevent a finding that Defendant Tyson enjoyed immunity from liability as a "volunteer" under either federal or Colorado law.**

   A.   **Disputes of fact and incomplete discovery prevents Plaintiff from determining whether Tyson meets the test of being a "volunteer" who enjoys partial immunity from liability under either federal or state law.**

Although Defendant Tyson claims to have been a "volunteer" working for a non-

-9-

profit organization on June 19, 2010, the facts uncovered in this case so far show a dispute

as to that contention.  First, it is not clear that Defendant CVA was a non-profit organization

as of June 19, 2010.  The IRS letter provided by Defendant Tyson, Defendant's Exhibit B,

is dated November 3, 1989, and does not demonstrate that Defendant CVA maintained

its 501(c)(3) status as of June 19, 2010, over 20 years later.  The exhibit and that part of

the Tyson Affidavit, therefore, fail to properly support a claimed fact and should be stricken

pursuant to Fed. R. Civ. P. 56(c).  Second, Defendant Tyson parses his status too finely.

His Affidavit states that he was not "paid any compensation for serving as a volunteer on

the day of the accident," Defendant's Exhibit A, ¶ 3, but it does not address whether that

month, or that year, Defendant Tyson could be considered to have received compensation

from Defendant CVA, other than pay, taking him out of volunteer status.   Nor does

Defendant Tyson's affidavit address what benefit, other than pay, he received for services

he performed for Defendant CVA.  A "volunteer" is "a person who gives his services without

any express or implied promise of remuneration." *Aspen Highlands Skiing Corp. v.

Apostolou*, 866 P.2d 1384 (Colo 1994), *citing Black's Law Dictionary* 1576 (6th ed. rev.

1990).  A person can work without pay, claim to be a volunteer, and still be considered at

law to be an employee.  *See, id.*  Disputes of fact, therefore, preclude a finding that Tyson

meets the immunity requirements of being a volunteer of a non-profit under 42 U.S.C.

14503.

     This analysis applies to Defendant's claim that he was a "volunteer" under Colorado

law, and therefore immune from liability under C.R.S. 13-21-116.  First, the immunity

granted by statute applies only to nonprofit corporations or organizations, by the plain language of the statute.  Defendant Tyson has not shown that, as of June 19, 2010, Defendant CVA maintained its 501(c)(3) status.  Defendant CVA was paid for its services by Defendant USOC, *see* Exhibit 5, and such payment may have taken CVA out of its nonprofit status.  By the very terms of Defendant's Exhibit B, the non-profit status extended to Defendant CVA in 1989 can be revoked.

Second, the immunity provided under § 13-21-116 applies only in instances where a persons acts as a "good Samaritan," and where no duty of care existed prior to that person's actions. *See*, C.R.S. 13-21-116(2)(a); *see also Combined Communications Corp. Inc. v. Public Serv. Co. of Colo.*, 865 P.2d 893 (Ct. App. Colo. 1993) (holding, in part, that "[t]he statute is expressly inapplicable except in those instances in which it is asserted that the act of providing non-compensated services or benefits to another by a donor results in the assumption by that donor of a duty of due care when, absent such act, no such duty would otherwise exist.").

Here, Defendant Tyson's duty argument is a red herring.  In this case, Defendant Tyson, as the person in charge of the Velodrome on June 19, 2010, had a common law duty to give warning of a dangerous condition he created, in part, by allowing competing activities such as speed runs and standing starts to take place at the same time. *See, e.g., Combined Communications*, 865 P.2d at 897 (holding that there is a common law duty to give warning of a dangerous condition created by a party if it was reasonably foreseeable that a failure to give such a warning might lead to injury or damage to another).  It was

reasonably foreseeable, particularly in light of prior similar incidents, that speed runs and standing starts being practiced at the same time on the same track would lead to injury.

Defendant Tyson assumed the obligation to supervise the activities at the Velodrome on behalf of Defendant CVA on June 19, 2010. Defendant's Exhibit A, Plaintiff's Exhibit 1. He opened the facility. He controlled access to it. He was the person in charge, by his own admission, and by the factual averments of others. Defendant's Exhibit A, Plaintiff's Exhibit 1, Plaintiff's Exhibit 3. He was the person who, under the Services Agreement between USOC and CVA, provided on-site management through the time the facility was open on June 19, 2010. Exhibit 3. In doing these affirmative acts, Defendant Tyson was under a duty to Emile Levy "to exercise the care of a reasonable man to protect [him] against an unreasonable risk of harm to [him] arising from that act." *Leppke v. Segura*, 632 P.2d 1057, 1059 (Colo. App. 1981). Moreover, as the on-site agent of Defendant CVA, Defendant Tyson was responsible for carrying out its obligations, as occupiers of premises, to use reasonable care with respect to dangers on the property, to prevent harm or injury. *See* CJI-Civ 12:2, 12:3. He was also responsible for carrying out its contractual obligations to provide (and implement and enforce) rules and regulations for racing and training sessions. Exhibit 3. Even assuming that this Court views the case against Defendant Tyson as a nonfeasance case, the special relationship of landowner/invited guest between CVA, its agent, and Emile Levy gave rise to a duty toward Mr. Levy. *See, e.g., Lewis v. Emil Clayton Plumbing Co.*, 25 P.3d 1254 (Colo. App. 2000) (noting that, in nonfeasance cases, the existence of a duty has been recognized where a

special relationship, such as possessor of land/invited entrant, exists).  As a matter of law,

Defendant Tyson owed a duty to Emile Levy.

Most importantly, however, Defendant Tyson filed his motion days after receiving

discovery from Plaintiff designed to ascertain, in part, Defendant Tyson's claim to be a

"volunteer." Affidavit of Pierre Levy, Exhibit 2.  Defendant Tyson has yet to respond to the

discovery, and has yet to sit for a deposition.  Exhibit 2.  Defendant Tyson has attempted,

through the filing of his motion, to short-circuit the discovery process and to prevent the

Court from evaluating, after full discovery, the merits of his claimed "volunteer" status.

Under Colorado law, a person is not a volunteer if that person receives compensation for

his services, even if that compensation is non-monetary, and benefits another. *See, e.g.,*

*Aspen Highlands* (ruling that a volunteer was an employee for purposes of Worker's

Compensation when his girlfriend received free ski passes in exchange for his non-paid

work for a skiing corporation).  Pursuant to Fed. R. Civ. P. 56(d), Plaintiff is entitled to

obtain discovery on those issues prior to the Court's ruling on Defendant's motion.

**B.     Even if the Court rules at this early stage of the proceedings, without discovery, that Tyson is a "volunteer," disputes of fact exist with respect to Tyson's entitlement to immunity under federal and state law.**

Even assuming that the Court fully accepts Defendant Tyson's "volunteer" status

and fully accepts Defendant CVA's nonprofit status, a prerequisite for immunity under 42

U.S.C. 14503, disputes of fact with respect to his conduct prevent the entry of summary

judgment in his favor.  Under federal law, a volunteer is not immune from liability if the

harm was caused "by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer." 42 U.S.C. 14503(a)(3).   In other words, if Defendant Tyson's conduct was anything but ordinary negligence, he enjoys no immunity under federal law.

As Defendant has pointed out, no federal cases seem to define or interpret the terms of 42 U.S.C. 14503(a)(3). However, those terms are common enough tort terms that this Court can look to Colorado law for guidance.   Indeed, Defendant himself has suggested that this Court can refer to Colorado law in interpreting these terms.   Motion at 6.   Under Colorado law, "willful" or "wanton" or "reckless" disregard "means an act or omission purposefully committed by a person who must have realized that the conduct was dangerous, and which conduct was done heedlessly and recklessly, either without disregard to the consequences, or without regard to the rights and safety of others, particularly the plaintiff."   CJI-Civ 9:30; *see also Tri-Aspen Constr. Co. v. Johnson*, 714 P.2d 484 (Colo. 1986).   Tyson's actions in deliberately walking away from a dangerous situation he controlled can lead a factfinder to conclude that his failure to warn or prevent competing activities was a purposeful omission.   Tyson's actions can also be found by a factfinder to be "reckless misconduct" or "flagrant indifference" to the safety of others, as those words are commonly understood.   Under federal law, therefore, a dispute of fact exists with respect to Tyson's conduct and his qualifying for the immunity extended by the Volunteer Protection Act of 1997.

-14-

Under state law, assuming that Defendant Tyson was conclusively a "volunteer" on June 19, 2010, the immunity extended to volunteers only extends to acts or omissions that were undertaken in good faith. C.R.S. 13-21-116(2)(a). Whether Defendant Tyson acted in good faith by walking away and failing to properly supervise the Velodrome when he knew that cycling there was inherently dangerous, presented a risk of collisions, and presented a risk of death is an inherently factual determination. *See, e.g., United States v. Asset Based Res. Group, LLC,* 612 F.3d 1017 (8th Cir. 2010) (in a case involving a good faith purchaser, "a finding of good faith is primarily a factual determination"); *see also De Rodriguez v. Holder,* 585 F.3d 227, (5th Cir. 2009) (Owen, J. concurring) (determination that marriage was in good faith is a factual determination). Moreover, Plaintiff has averred in her Affidavit, Exhibit 1, that Tyson was in charge of the Velodrome, witnessed Emile Levy practicing speed runs, and that he should have warned the Kacala couple with respect to this activity. Defendant USOC has stated that Defendant Tyson was "supervising the track during the day long training session." Exhibit 3. Likewise, Defendant USOC has suggested, in its investigation report, Exhibit 3, that best practices regarding safety were not in place and were not enforced on June 19, 2010. Exhibit 3. Despite these known dangers, despite his role as the supervisor and on-site manager of the facility, and despite his own admission that he was in charge at the Velodrome on June 19, 2010, Defendant Tyson walked away and went inside to "get a drink" shortly before the collision. Defendant's Exhibit A. At a minimum, disputes of fact exist as to whether Defendant Tyson was acting in good faith while supervising the Velodrome on June 19, 2010.

Even accepting Defendant's cite to the ancient case of *Pettingell v. Moede*, 271 P.2d 1038 (1954) (decided under a former Guest Statute), without looking at more recent law, disputes of fact as to Defendant Tyson's state of mind preclude a finding, prior to the conclusion of discovery, that Defendant Tyson's actions were not reckless or in wanton disregard for the safety of others. The cornerstone of the *Pettingell* holding is that a finding of willful and wanton disregard requires that "the actor was fully aware of the danger and should have realized its probable consequences, yet deliberately avoided all precautions to prevent disaster." *Id.* at 1042-43. Here, Defendant Tyson was fully aware of the dangers present at the Velodrome. Exhibit B to Answer [Doc. No. 25], Exhibit A to Answer [Doc. No. 24]. Tyson spent a good part of the day at the Velodrome. Defendant's Exhibit A, Plaintiff's Exhibit 3. He was aware of Emile Levy's timing runs or speed runs. Plaintiff's Exhibit 1. He was in a position to warn both Emile Levy and the Kacala Defendants about the danger of standing starts. Plaintiff's Exhibit 1. He chose to ignore the danger. Defendant's Exhibit A. This choice led to disaster, a collision that rendered Plaintiff's husband a ventilator-dependent quadriplegic and, nine weeks later, resulted in his death.

Defendant Tyson has told the Court, contrary to his own position in his Answer, that cycling at the Velodrome is not a dangerous activity. Defendant's Exhibit A, ¶ 8. Defendant Tyson's own statements as to his actions on June 19, 2010, and his inconsistent positions with this Court, create issues of fact with respect to his state of mind on June 19, 2010.

Finally, Defendant's argument that acts of omission cannot evidence purposeful conduct is directly contrary to the plain language of Colorado law. CJI-Civ. 9:30 expressly considers omissions as a basis for a finding of wanton and reckless disregard. The jury instruction states:

> ("Willful and wanton conduct") ("Wanton and reckless disregard of the rights and feelings of others") means an act or omission purposefully committed by a person who must have realized that the conduct was dangerous, and which conduct was done heedlessly and recklessly, either without regard to the consequences, or without regard to the rights and safety of others, particularly the plaintiff.

The plain language of the instruction, therefore, allows for omissions to be found wanton or in reckless disregard of an injured person's right.

### C.      Discovery in this case needs to be completed, so that the Court can have a proper record prior to ruling on Defendant's motion.

Pursuant to Fed. R. Civ. P. 56(d), Plaintiff is entitled to discovery to ascertain the full extent of Defendant Tyson's status and of his conduct on the day of the accident. Defendants have claimed, in their Answer, that they were aware of at least one prior accident with a similar fact pattern as the one that was fatal to Emile Levy. Defendants have conducted an investigation into the events of June 19, 2010, but have not provided complete results to Plaintiff. Plaintiff has sought the complete investigation in her discovery requests. Plaintiff has sought discovery designed to shed light on Defendant Tyson's "volunteer" claim. In addition, Plaintiff anticipates that depositions in this case will demonstrate prior knowledge, and notice, of similar accidents on the part of Defendants,

including Defendant Tyson. Because at this early stage of the proceedings, with discovery barely under way and with Defendants not having answered Plaintiff's first round of discovery, Plaintiff is unable to fully justify her adverse position to the motion, the Court should, at a minimum, allow discovery to proceed to conclusion prior to considering and ruling on the motion.

### Conclusion

For the reasons stated herein, Plaintiff respectfully requests that the Court deny Defendant Tyson's motion for summary judgment in its entirety, and provide Plaintiff any other relief the Court deems just and proper.

Respectfully Submitted,

Lee Rosenbaum, Esq.
The Law Firm of Lee K. Rosenbaum, P.C.
1902 West Colorado Avenue
Colorado Springs, Colorado 80904
(719) 634-0102
Fax: (719) 634-0103
email: rosenbaumpc@pcisys.net
Attorney for Plaintiff

O'Friel and Levy, P.C.
Pierre Levy, Esq.
P.O. Box 2084
Santa Fe, New Mexico 87504-2084
(505) 982-5929
Fax: (505) 988-5973
email: pierre@ofrielandlevy.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed with the Court's CM/ECF system on August 19, 2011, which caused all persons on the Court's service list to receive a true and correct copy of the foregoing on the date of filing.

Pierre Levy